May it please the Court, Candice Carruthers, Assistant Federal Public Defender for Mr. Griffith. There is an absolute prohibition against a witness providing expert opinion regarding the credibility of any witness. This rule was violated at Mr. Griffith's trial when two impressively qualified law enforcement officers testified that Mr. Griffith's version of events was untrustworthy. Because this testimony was highly prejudicial and likely to sway a jury, reversal is required even though this Court's review is for a plain error. The only, for those two parts of the testimony that they addressed credibility, it was only with regard to the defendant's version of events surrounding his going to Amanda's house and having sex with her where she was impregnated in terms of whether he used erectile dysfunction medication, whether it was the first or second time. But it was only that event in 2019, not any of the events in 2011, correct? Correct. With respect to Sergeant Harris, his comments were that in response to a portion of video that Mr. Griffith had where he said, and the questions he was asking him are, we've got these allegations against you, what do you say to those things? So he says, so his full, in the statement, Mr. Griffith, what he's saying is, he's talking about more than just the 2019 incident. He's denying any type of inappropriate conduct relationship with her ever. And he says, she's made these allegations before, they're not true. So he is responding to, like the statement, the 11 minutes of testimony that was played for the jury, he talks about, he denies all of the accusations. And Sergeant Harris was the second to last witness the jury heard from. He told them that he had received 800 hours of training at the academy, 500 more hours since then. And similar to Hill, told the jury he had attended the Reed School, where he received interrogation specific training. And Harris told the jury he had interviewed dozens of suspects. He was asked to offer his expert opinion, quote, based on his training and experience about Mr. Griffith's explanation that he had AW, consensual intercourse with AW. Sergeant Harris then impermissibly told the jury, specifically, that Mr. Griffith's response seemed dishonest, completely fabricated, and that he just did not believe a word Mr. Griffith said. And then Harris said, in my experience, Mr. Griffith seemed untruthful because it took him too long to answer, deflected by not answering, and then went on a tangent. But this was improper, because Griffith's jury was fully able to sort out the fairly obvious and commonly understood issues of veracity without that testimony. With respect to Agent Girard, the final witness, he- Let's stick with- Okay. Yes. With Harris for a moment. On cross-examination, he said, I never lie when I'm questioning the witness. And then counsel Redneck, part of the recorded interview in which Harris says, I believe you, and correct me if I'm getting this wrong, and then defense counsel says, so you believed the defendant at that time? And he said, yes. Doesn't that detract a lot from the credibility of Harris's credibility testimony? With respect to the fact that he would- Well, one was he saying, I never lie to the defendant when I'm questioning him, and I told him I believed him at the time. I think if I heard the guy testify to that, I'd discount Harris's testimony quite a bit. I don't think the jury would have done that, Your Honor, because Harris, early in his testimony said- Also, Girard said this too, so I hope I'm not confusing them, but he said, sometimes I go along with what they say to get them on my side, to get them comfortable, to get them to open up. And so it was more of his trained tactics that he was- What I just quoted was from early in his testimony on direct with the prosecutor. He testified, I think this was on 296, I can check that, but on volume 2, 296, Sergeant Harris testified he would not lie to a suspect or an individual. Okay, and then you said- I'll just quote what I have here. Okay, and then you said at about the 24th minute mark in that interview that he was explaining his story when he impregnated, story. You said at that point that you believed him, correct? Harris says, correct. And a little later, okay, so you believed that it was the truth at the time, yes, sir. So here's this expert interrogator who now is testifying. I believed the Ted defendant when I was interrogating him when he said this, when he has already testified that I didn't believe him. That- he would have been better off if he said, well, sometimes I do go along with them, I don't know. But to say I never lie to someone I'm questioning, anyway, there's no way to reconcile all the things he said. It doesn't- Doesn't that impact whether the statement by Sergeant Harris specifically on whether he believed the defendant, doesn't that reduce the forcefulness of that, the persuasiveness of that, and make it much less likely that his testimony on the issue was prejudicial? Also given the fact that, as you pointed out, I think correctly, the sorts of things that led Harris to believe the defendant wasn't telling the truth are the sorts of things that everybody uses in determining credibility. First, Sergeant Harris's answer was incredibly poisonous. His statements, they seemed dishonest, completely fabricated, did not believe a word he said in response to his entire defense theory about all of this being consensual. That's incredibly poisonous. It doesn't remove the poison or act as an antidote to discredit him somewhat later. Now it may- I'm sorry, didn't mean to interrupt. And I also wanted to say that it was- you're correct, Your Honor, that Sergeant Harris mentioned things that are commonly understood to show whether an individual is not telling the truth, but that was not his place. The jury had the vital and exclusive function to ask those questions and think about those reasons for why he may have made those different statements, been inconsistent, why he went on a tangent. They had no reason to answer those questions and do that homework because somebody did it for them. And this is someone who says, in my experience, he took too long to answer. He's not saying, just as a normal human being, based on- he's saying, in my training experience, 800 hours at the Academy, 500 more since then, and attendance at the Reed School, and after interviewing dozens of suspects, in my experience, he took too long to answer. But what you were saying was, when you said all of it was consensual, well, the only event that Russell ever said was consensual was when Amanda was already of majority age. Correct. I meant to say he's never done anything unlawful with her, period. So he's never had any inappropriate- Well, I think that may be significant. So if the two officers are opining about- Just count three. If they're opining about his credibility in something that is not even part of the criminal charge, or the criminal charge was predicated on what had happened prior to him having sex with her of majority age, when she was not of majority age, and that was not part of the government's theory of guilt, doesn't that make a difference? It does. I want to add that what was also said in that 11 minutes of tape that was played for the jury, Mr. Griffiths said, I've raised her as my daughter, I've never had an inappropriate relationship with her. So he's saying, he is denying- He's certainly denying things, but I thought what your point was is when both officers are saying, I don't believe the defendant, isn't it at least a fair inference that they were talking about his account of the consensual nature of the sex when he went over across the street and had sex with her? I think the stronger inference is that he didn't believe anything he said in that 11 minute tape, not just specifically the intercourse. In that whole 11 minutes, she says, I know that was a long clip, but what do you think, in your training experience, what would you say about his demeanor? Does it matter that the defendant never even testified, that the government's theory of guilt was based on the credibility of Amanda, not any inconsistencies or anything about Russell because Russell never testified?  That was the same facts in Hill. Hill didn't testify. And environmentally, this court said that that made a difference in the substantial rights analysis, that the jury had no opportunity to wait to see Mr. Griffith speak about these incidents for themselves. And so these experts who had that opportunity, they would have relied on their understanding more. So this actually makes our case more harmful and more like Hill. And just to speak on the harm in this case, the testimony was highly prejudicial for at least three reasons. There was no physical evidence of the assaults, no eyewitness testimony of the assaults. The only direct evidence came from A.W. And so the jury had to pick who to believe, A.W. or Mr. Griffith, who adamantly denied the allegations. And... And I have a question. Yes, please. Yes, Your Honor. Now, because your time is getting short, and this is all, looks to me like I'm playing error. Jump to the presence in there, because it kind of goes to the backtrack from me, his question earlier, because they still have the testimony of the victim. You have other witnesses who were testifying. So, and his explaining of how, you know, that he may, could have been more, the jury could have been more inclined to believe him than the story that was told by the victim. So please address prejudice before we run out of time. Again, this testimony was highly prejudicial because there was no physical evidence of the assaults, no eyewitnesses to the assaults. And the only direct evidence came from A.W., and there were reasons to doubt her. She only recanted her first claim against Mr. Griffith after spending four months in inpatient treatment and resuming her medication for her borderline personality disorder. That makes a jury question. And then, and in addition, the defense had presented a plausible theory about why she was making these allegations now. And so her testimony alone does not dispel a reasonable probability of a different result. And the circumstantial proof certainly does not get us anywhere closer. Moving over the... The jury heard that testimony, didn't they? Which... Did the jury hear what you were just going over? The jury heard it, and they could not fairly review it because of the extreme poison that the two impressively qualified officers gave an opinion that placed a heavy thumb on the scale in favor of A.W. against Mr. Griffith. In addition, I would like to also say that this was not just a passing remark. The judge, he said, he actually pointed to characteristics and demeanor and behavior to kind of like explain his... He's like, he not only just said, I don't believe him. He said, I don't believe him because... And pointed to things that in his experience showed dishonesty. That makes this case like hell. And we also have an expert witness instruction in this case that says... That was not limited to any expert. And it says, you heard testimony or witnesses in this case who had specialized knowledge were able to... May provide an opinion based on that specialized knowledge. And so it almost emphasized that Harris and Gerard had made legitimate statements that the jury could rely on. And all the other circumstantial evidence just is not overwhelming. There's no physical evidence of the assault. No eyewitnesses. And we have a single witness. The direct evidence comes from someone with a lot of problems. And that the jury had... There's a lot of problems with this witness. And... The government helped its case by bringing up two individuals to push the thumb... Push their thumb on the favor of A.W. and her reliability by discrediting Russell's entire theory of the case. And that was inappropriate and supports reversal. And I'd like to save the remainder of my time for a vote. Thank you. Thank you. Good morning, your honors. May it please the court. Counsel, my name is Lisa Williams. And I am representing the United States of America. I'd like to pick up with some of the questions that the court was asking. Specifically, the very first question out of the gate. About isn't this statement of Sergeant Harris' really limited to the information about the 2019 series of sexual assaults. And the government's position is that it is. The way that the evidence of those interviews were presented at trial was there were various clips and they were all different exhibits. And the government had just played exhibit five prior to the exchange that is at issue. And exhibit five did address just that 2019 assault. It was long, but that's what he was talking about in there. And then the question is, can you describe the defendant's demeanor during his statement to you? The statement contained on exhibit five. And this is on page 212 of the transcript. And so we're not talking about his general denials that he made during the course of the entire interview. We're focusing in on the statements that he made during this specific part, the 2019 part. And let's parse out that statement a little bit. Because while Hill is very clear about what an expert can comment on, a officer is entitled to describe the demeanor of someone who is participating in an interview with. And that was the question. Describe the demeanor. And that's fair game. You can ask, you can say he was nervous. He appeared to be sweaty. His hands were shaking. He didn't make eye contact with me. Those are all fine things for an officer to testify to. And that's half of the statement. He mentions that he took too long. He deflected. He didn't answer the question. He went off on a long tangent. So all of that is not objectable. That's fair game for the officer to say. What is at issue in this appeal is kind of the first statement and then the ending statement. To me, it seemed dishonest. I just did not believe a word he said. But for that to constitute an error, it does have to be given by an expert. And what's fascinating, I think, is during cross-examination, the defense attorney comes back to this issue. And this is on page 218 of the transcript. And says, OK, this is the defense attorney on cross. And you are not an expert in any way on lie detection, correct? And Sergeant Harris says, correct, correct. And then the defense attorney says, so you're feeling earlier about him being untruthful. That's just your opinion. And Sergeant Harris says, that's correct. So I think the defense attorney highlights to the jury through that line of questioning that Sergeant Harris isn't necessarily giving an expert opinion regarding the truthfulness of the defendant during this interview. And if it's not an expert opinion, then Hill and the cases relied on by the defense don't apply. So that's why the government believes that, first of all, there's not an error with this line of questioning. But as the government stated in its brief, the court doesn't have to address whether or not it's an error because since we're on plain error review, the defendant also has to prove that there's a reasonable probability that the outcome would have been different. And here what that means is a reasonable probability that this jury would have found the defendant not guilty had those two lines not been introduced in the trial. And the government submits that that's not reasonable given the significant amount of evidence. Starting with this interview in itself. So what the objective testimony is, is that the officer is calling the defendant a liar. Saying he's being dishonest. But here's the thing. He did lie. He was being dishonest. Because you have the 2019 interview in December and then the October 2020 interview by the FBI agent. And he says different things in those interviews. Wildly different things. First interview he says he only had sex with Amanda once. Second interview he says he had sex with her twice. Which I would submit is a very significant change of story. I think you remember all the times you have sex with your stepdaughter. I just have to say if it's once or twice. That's not something that you accidentally confuse. Is your point, I mean, I guess what is your point? My point is that the jury would have been able to parse that he was lying without Sergeant Harris saying that. And so the prejudicial effect of him saying he's dishonest is minute. Prong three. That's prong three, right. So that goes to whether or not they would have returned the not guilty verdict but for Sergeant Harris saying I think he's dishonest. This jury would have figured that out on their own because of these glaring inconsistencies between the two different interviews. And juries aren't stupid. I mean, they understand the difference. He also said I had to take erectile dysfunction medication and so it had to be planned. And then the next interview he says, oh, no, I didn't have to take erectile dysfunction. It was a spontaneous sexual event. He said once he had to wake her up in the morning and then he said the next time, oh, no, she was already up. So the jury would have looked at this and said, well, he's lying in December or he's lying in October but he's lying. And so that really weakens the prejudicial value of any error. Then we look at all the other evidence. We keep hearing that there's no evidence of, no eyewitness testimony or physical evidence. But here's the thing, when your stepdaughter rapes you when you're nine years old, there aren't witnesses to it. And that rape goes on for 14 years, there aren't eyewitnesses. There isn't physical evidence. These types of cases don't have that type of evidence. That's just how they work. And so we would expect not to see that type of evidence. There is a great deal of corroborating evidence from the friends and family who testified. I mean, let's step back and talk about Regina Griffith's testimony. So Regina is the defendant's stepmother. She's been married to his dad for 30 years. And she's the one that, when they were in Bristow, meets at her place of work, like under the cover of darkness. She said, I didn't want the defendant to see me there because he was going to get really upset. And there's a little bit of a limitation by the district court about what exactly Regina wanted to talk to Chastity about during that meeting. She gets to say that she printed out materials on the internet and about mistreatment at home. That's in the record. And then they have the meeting. But on Chastity's cross-examination, Chastity admits that what that conversation was about is Regina talking to her about domestic violence and sexual assault. That's at the record at 261. So when Regina says, I was uncomfortable because I saw things, she was uncomfortable enough that she arranged a way to confront Chastity about sexual assault and domestic violence issues in the hold against her own stepson. I mean, that is significant corroborating evidence for a stepmother to do that and take those steps. She really had some reasons to believe that terrible, terrible things were going on in the house when she took the steps to have that specific of a conversation with Chastity. There's, of course, all of the outcrying that Amanda did before she was able to finally remove herself from the situation. There's a lot in the record about this 2009 allegation that she makes against Keith. And the record's clear that she said it was Keith is her father. She said that she claimed her father sexually abused her because the defendant told her to say that it was her dad. And again, it's hard to pull through from the record. But if you go to Chastity's cross-examination, she's asked that, isn't it true that at first Amanda alleged that it was Russell, the defendant, who was abusing her before she turned and claimed that it was her father, Keith? That's at page 263. And Chastity says, well, I can't remember, but if I said that on video, then that's what's true. And the inference was that the video was her giving a statement saying, well, she said it was Russell first and then Keith. So this first incident of Amanda crying out, which the defense likes to characterize as a false accusation, was actually an accusation against the defendant himself. Can I ask you a question? Yes. Because I may have misremembered or misunderstood. I thought that Chastity was the only individual that said Amanda had complained about anybody, particularly Keith. And so obviously, the defendant does that there was these prior complaints of abuse, including the one in 2011. But I thought that the government's point on that was, well, that was not from Amanda. That was from Chastity. That's the very first allegation of abuse when Amanda was four years old. And that was against her grandfather. And Chastity is the only one who has ever told anybody that, the grandfather. Because the defense argues that Amanda just says that everyone sexually abused her. And the government's argument is, no, she doesn't. She never said her grandfather. And then there's that DHS report that has that powerful language in it that says, Miss White wants custody and wants to cause trouble. And they interviewed Amanda during that investigation. And Amanda never disclosed to DHS. So that's just Chastity. So that's the first instance she's four. 2009, I think she's about 11 or 12 years old. And that's when she alleges that her father had been sexually abusing her. But first she said it was the defendant. And then she changes. And she says at trial, I changed because Russell told me to say it was my dad. And then there's 2011, where again, she outcries to a friend at school and says, this is happening to me. And she is removed from the situation. Well, I'll keep talking. Stop the talking until we get Judge Baldock so we can look at him. Make sure he's not here. I'm here. OK. I just couldn't see you. So she. Yeah. Yeah, I appreciate that. So she outcries again in 2011. And that's the incident where they put her in a mental institution that she's not allowed to leave from until her mom keeps on putting the defendant on the phone, who tells her, it's not me. You can fix this. And you can reunite the family. And we can all be back together again if you say that it's not me. And she does. And that's when the government's expert testimony really comes into play. And we start hearing from the expert that when children are placed in these situations, they often recant. And they recant for a wide variety of reasons. But what struck me as one of the most powerful lines from that expert testimony is these little kids, they hate the abuse, but they love the abuser. And they just want the abuse to stop. And that's why they recant. Because they don't want to destroy the family. They don't want to blow it up. They just want the abuse to stop and to get to go back and be with the people that they love. So her recanting in 2011 makes total sense when you understand the expert testimony about why children recant. So what there's evidence of is that throughout her childhood, Amanda tried to tell people about what this defendant was doing to her. And unfortunately, she didn't get the help that she needed. But Regina saw what was going on and thought that it was wildly inappropriate. She didn't see what was going on. She didn't see. She could sense. I mean, she was around the family. She observed their interactions. She saw him with his arms around Amanda's breast area at the holiday gathering, which she thought was very inappropriate. And then Miranda Griffith, the cousin, she was the one that walked in on him on the couch that she was very uncomfortable about. She saw Amanda sitting on the defendant's lap right over his penis. And don't forget, she's not nine. This isn't a nine-year-old girl sitting on her stepfather's lap. When she's with Miranda in Bristol, they're in high school. This is like a sophomore in high school sitting right over her stepfather's penis. That is not appropriate. That is inappropriate eyewitness observation of what's going on between the two of them. There's all the record that how controlling he was. In fact, I believe it was Sergeant Harris that said after some of these interview clips it was clear that he was extremely controlling, that he controlled every single aspect of Amanda's life, which again is not normal, but it is evidence of this inappropriate relationship. Of course, and I forgot when I was talking about disclosures, there's the disclosure to the same nurse, which was yet another disclosure. The fact that after Regina confronts them, they move the next day. When you're going to move, you plan it. If it's a normal move, you tell people. You have things lined up. So again, there's significant evidence. I see that I'm out of time, and I would rest on the government's brief for the rest of the arguments. Thank you, Your Honors. You're almost out of time. I'll try to be quick. Regina and Montana testify that they never saw anything illegal. Their testimony does not prove that the sex assaults happened. They prove that they were uncomfortable at some points. That's not overwhelming proof of sex assault. And there can be proof that comes out in Charlie, for example. The child in that case was a sex abuse case with the same issue. The child had a medical history from her years of abuse that were unexplained things that made no sense that the sex abuse could finally explain. And the defendant there had a prior sex abuse charge. Mr. Griffith has none. And so I think that there can be stronger proof than that we have here. This case is just not strong enough. And finally, Your Honors, the prosecutor discussed the inconsistencies. There could have been more reasons for those inconsistencies. He could have been embarrassed to be having an affair. Maybe he doesn't want to disclose every time he's had a sexual intercourse with someone who's not his wife. He may have been embarrassed to be on ED medicine. He may not want to share that. It may not have come out. The jury had no reason to consider those things because somebody had done that homework for them. And for that, I would ask you to reverse. Thank you. Case is submitted. Thank you, Counsel. Counsel is excused.